## UNITED STATES DISTRICT COURT

_____ SOUTHERN _____ DISTRICT OF _____ CALIFORNIA `FILED`

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

08 APR 30 AM 10: 29

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

1390 Santa Alicia Avenue
#10208
Chula Vista, CA 91913

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**CASE NUMBER:** '08 MJ 1353

DEPUTY

I ___ Mark Kolenda ___ being duly sworn depose and say:

I am a(n) _Special Agent, Federal Bureau of Investigation_ and have reason

to believe that _____ on the person of or _X_ on the property or premises known

as (name, description and/or location)

1390 Alicia Avenue, #10208, Chula Vista, CA., 91913, further described as a
multi building apartment complex consisting of over 10 buildings. Building #10 is
further described as a three story white and brown stucco building located in the
southwest area of the complex with the number 10 affixed to the building. Apartment
#10208 is located on the second floor of the southeast corner of building #10 with
the #10208 affixed to the wall adjacent the door to the apartment.

in the _____ SOUTHERN _____ District of CALIFORNIA _____
there is now concealed a certain person or property, namely (describe the person or property)

See ATTACHMENT A

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal
Procedure)

property that constitutes evidence of the commission of a criminal
offense, contraband, the fruits of crime, things otherwise criminally
possessed and property designed and intended for use and which is and has
been used as the means for committing a criminal offense.

concerning a violation of Title _21_ United States Code, Sections _841, 842, 846,
952 and 960._

The facts to support a finding of Probable Cause are as follows:

See attached AFFIDAVIT

Continued on the attached sheet and made a part thereof. _XX_ / Yes _____ No

_____
Signature of Affiant -

Sworn to before me, and subscribed in my presence

_4-29-08 @ 5:00 PM_ at _San Diego CA_

Date
**NITA L. STORMES**
**U.S. MAGISTRATE JUDGE**

City and State

Name and Title of Judicial Officer                    Signature of Judicial Officer

Attachment A

1.     Books, records, receipts, notes, ledgers, emails, and other documents relating to violations of 21 U.S.C. §§ 841 (a)(1) (illegal distribution of controlled substances), 846 (conspiracy), 842(a)(1) (dispensing controlled substances without prescriptions), 952 (importation of controlled substances), 963 (conspiracy to import controlled substances), and 331(a) & 333(a)(2)(introduction into interstate commerce of prescription drugs - controlled and non-controlled - dispensed without prescriptions), involving MISAEL RODRIGUEZ SANCHEZ and JORGE ALAN RODRIGUEZ SANCHEZ, or anyone else using the email address pharmavet@hotmial.com in furtherance of these offenses, since May 23, 2002, including

        (a) lists of customers and related identifying information;

        (b) types, amounts, and prices of drugs distributed, as well as dates, places, and amounts of specific transactions;

        (c) sources of drugs (including names, email and physical addresses, phone numbers, or any other identifying information) information pertaining to the identity of individuals with whom JORGE ALAN RODRIGUEZ SANCHEZ is conducting business.

2.     The importation, storage and shipping of drugs; eny evidence of the existence of a drug storage facility within the United States.

3.     Any customers lists, mailing lists, and material used to package and ship bulk and prescription drugs packing materials such as bubble wrap, padded mailing envelopes, mailing boxes, labels, as well as records relating to any self-storage locations and keys to self storage units.

4.     Bank records, checks, credit card bills, account information, and other financial records.

5.     Identifying and locating information for Jorge and Misael Sanchez as well as for associates Miguel Rodriguez Sanchez, Roberto Fermin Perez Valdivia, Rafael Labrada Lopez, Brenda Gisela Favela Sepulveda and Angelica Acevedo.

6.     Bank and other financial records, receipts, notes, ledgers, emails, wire transfers, and other papers relating to the receipt of monies from drug sales, including Western Union records or receipts.

7.     Records showing association with the sport of mixed martial arts associated with UCM Ultimate Challenge Mexico.

8.     Indicia of occupancy, residency and or ownership of the premises including but not limited to utility and telephone bills, cancelled envelopes, and keys.

9.     Records relating to Mr. Mail or other entities in the business of shipping packages in the United States including but not limited to United Parcel Service (UPS), Federal Express (FEDEX), the United States Postal System, and DHL.

10.    Records relating to referral websites purporting to refer customers to sources of controlled substances.

11.    The records identified above include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, USB drives, memory sticks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

12.    All computers capable of accessing the email address Pharmavet@hotmail.com, or storing any of the evidence described above, together with the computer hardware, computer software and computer documentation, including but not limited to tapes, cassettes, cartridges, commercial software and manuals, computer disks, CD-ROMS, DVDs, disk drives, monitors, printers, scanners, modems, tape drives, cell phones and their memories, and other computer-related equipment. This includes the following:

    a.     Any devices capable of storing information and/or data in the form of magnetic electronic or optical coding on computer media, or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, CD-Roms, DVDs, key-chain data storage devices, zip disks, and any other media which are capable of storing magnetic coding, as well as punch cards, and/or paper tapes, and all printouts of stored data.

2

b.    Any and all electronic devices which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer peripherals, word processing equipment, modems, monitors, cable printers, plotter, encryption-circuit boards, optical scanners, external hard-drives, external tape backup drives and other computer-related electronic devices.

c.    Any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer, or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

d.    Any and all written or printed material which provides instructions or examples concerning the operation of the computer systems, computer software and/or related device, and sign-on passwords, encryption codes or keys or other information needed to access the computer system and/or software programs.

e.    All passwords and encryption keys. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### I.    INTRODUCTION

I, Mark Kolenda, being duly sworn, depose and state as follows:

1.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), San Diego Field
Division, and have been an agent since February 2004.  As a Special Agent, I have
participated in numerous investigations concerning healthcare fraud and the illegal
distribution of prescription narcotics and controlled substances, including cases where
the drugs were sold over the internet.

2.    I submit this affidavit in support of a search warrant for the residence of JORGE ALAN
RODRIGUEZ SANCHEZ, located at 1390 Santa Alicia Avenue, #10208, Chula Vista, CA
91913, further described as a multi building apartment complex consisting of over 10
buildings.  Building #10 is further described as a three story white and brown stucco building
located in the southwest area of the complex with the number 10 affixed to the building.
Apartment #10208 is located on the second floor of the southeast corner of building #10 with
the #10208 affixed to the wall adjacent the door to the apartment.

3.    This affidavit is based on an investigation conducted by myself as well as Federal Bureau
of Investigation (FBI) Special Agents (SAs) Jason Huff, Ronald D. Manning, William R.
Wickman, Matthew F. Giacobbi, Adam Pranter, and Immigration and Customs Enforcement
(ICE) SA John Arruda.

4.    Based upon the information set forth below, there is probable cause to believe that
MISAEL RODRIGUEZ SANCHEZ and JORGE ALAN RODRIGUEZ SANCHEZ, as well
as others known and unknown to the grand jury, are using the email address

pharmavet@hotmail.com  to distribute controlled substances and other prescription medications  to customers within the United States, without prescriptions, in violation of 21 U.S.C. §§ 841 (a)(1) (illegal distribution of controlled substances), 846 (conspiracy), 842(a)(1) (dispensing controlled substances without prescriptions), 952 (importation of controlled substances), 963 (conspiracy to import controlled substances), and 331(a) & 333(a)(2)(introduction into interstate commerce of prescription drugs - controlled and non-controlled - dispensed without prescriptions), and that evidence of this offense can be found at the residence of JORGE ALAN RODRIGUEZ SANCHEZ, located at 1390 Santa Alicia Avenue, #10208, Chula Vista, CA 91913.

5.      As set forth in more detail below, the following facts are submitted in support of probable cause:

a.      Between April 2006 and July 2007, FBI agents made four undercover purchases of controlled substances from individuals using the email address pharmavet@hotmail.com, without a prescription or face-to-face examination by a doctor.

b.      To pay for the purchases, the agents were directed to send the money via Western Union to Mexico.  For three of the transactions, they were directed to send it to MISAEL RODRIGUEZ SANCHEZ.  One time, MISAEL RODRIGUEZ SANCHEZ provided a birth date of September 26, 1981, and an address of "Carlos 55," to Western Union when he picked up the money.      SANCHEZ provided

2

the same birthdate in 2001 on an application for a visa.

c.     In May 2006, as a result of the execution of a federal search warrant for all emails pertaining to the email account pharmavet@hotmail.com, the agents obtained more than 400 emails that pertained to the distribution of controlled substances without a prescription. These emails showed that for many of the purchases, the customers were directed to send the money to MISAEL RODRIGUEZ SANCHEZ.

d.     JORGE ALAN RODRIGUEZ SANCHEZ, the brother of MISAEL, sent and received emails in 2002 using the pharmavet@hotmail.com email address in furtherance of the distribution of controlled substances. In 2007, he used the same email address in connection with a drug transaction and the promotion of martial arts events.

e.     Between March 1 and March 11, 2008, someone logged onto the pharmavet@hotmail.com email account from an internet connection terminating at the apartment almost directly above the apartment of JORGE ALAN RODRIGUEZ SANCHEZ in Chula Vista, California. SANCHEZ has resided there since February 2008 and does not have internet access with Cox Communications at this location. On March 27, 2008, I determined that there were four open wireless internet connections in the vicinity of SANCHEZ's apartment that someone could use to access the pharmavet@hotmail.com email account.

f.     On March 26, 2008, JORGE ALAN RODRIGUEZ SANCHEZ crossed into the

3

United States from Mexico.  On March 27, 2008, I observed the vehicle he was driving when he entered the U. S. parked in front of the apartment complex at 1390 Santa Alicia Avenue, Chula Vista, CA 91913.

g.     On April 8 and 9, 2008, the email account pharmavet@hotmail.com was used to discuss the sale of a controlled substance.

6.     Any person who stores, handles, distributes, or imports controlled substances must be licensed by the Drug Enforcement Administration (DEA).     Neither Pharmavet@hotmail.com, JORGE ALAN RODRIGUEZ SANCHEZ, nor MISAEL RODRIGUEZ SANCHEZ are licensed by the DEA to store, handle, distribute, or import controlled substances.

7.     The activities described in this affidavit violate the following federal criminal laws:

- 21 U.S.C. § 841 (a)(1) (illegal distribution of controlled substances)

-21 U.S.C. § 846 (conspiracy)

- 21 U.S.C. § 842(a)(1) (dispensing controlled substances without prescriptions)

-21 U.S.C. § 952 (importation of controlled substances)

- 21 U.S.C. § 963 (conspiracy to import controlled substances)

- 21 U.S.C. §§ 331(k) & 333(a)(2)(introduction into interstate commerce of prescription drugs - controlled and non-controlled - dispensed without prescriptions)

8.     Section 812 of Title 21, United States Code, establishes schedules of controlled substances for drugs which present a potential for abuse and a likelihood that abuse of the drug could lead to physical or psychological dependence on that drug.  Such controlled substances are

4

listed in Schedules I through V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. These drugs are regulated as controlled substances because they are dangerous. There are other drugs which are available only by prescription but are not classified as controlled substances.

9.    Prescription drugs, including controlled substances may only be dispensed or distributed by those persons who are registered with the Attorney General to do so (with some exceptions, such as delivery persons). 21 U.S.C. § 822 and may only be dispensed pursuant to a valid prescription. 21 U.S.C. §§ 353, 829.

10.    21 CFR § 1306.4 provides that a "prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not [a lawful prescription] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

11.    The DEA has published a website with comments about the regulation of the dispensation of controlled substances. The website states that acting within the course of professional practice "includes having an established doctor-patient relationship based upon a medical history, a physical exam and diagnosis. There must be a logical connection between the medical diagnosis and the controlled substance prescribed. A prescription written based

5

solely upon an on-line questionnaire does not meet these requirements. It is not a valid prescription and the distribution of any controlled substance pursuant to an invalid prescription is illegal." This has been set out at "Records Comments About On-Line Pharmacies" and can be found on the Internet at http://www.dea.gov/pubs/pressrel/diversion_actualities_transcript.html.

12. The DEA has published a guide on Dispensing and Purchasing Controlled Substances over the Internet. This document can be found at the internet site www.deadiversion.usdoj.gov/fed_regs/notices/2001/fr0427.htm. In this document, the DEA lists the following four indicators of a legitimate doctor/patient relationship:

I.     A patient has a medical complaint.

II.    A medical history has been taken.

III.   A physical examination has been performed.

IV.    Some logical connection exists between the medical complaint, the medical history, the physical examination, and the drug prescribed.

13. In the document mentioned in Paragraph 12, the DEA also states that "Completing a questionnaire that is then reviewed by a doctor hired by the Internet pharmacy could not be considered the basis for a doctor/patient relationship."

14. The American Medical Association (AMA) has provided guidance for physicians on internet prescribing. The AMA states that physicians who prescribe medications via the Internet "shall establish, or have established, a valid patient-physician relationship, including, but not limited to, the following components. The physician shall: i. obtain a reliable medical history and perform a physical examination of the patient, adequate to establish the diagnosis

6

for which the drug is being prescribed and to identify underlying conditions and/or contraindications to the treatment recommended/provided; ii. have sufficient dialogue with the patient regarding treatment options and the risks and benefits of treatment(s); iii. as appropriate, follow up with the patient to assess the therapeutic outcome; iv. maintain a contemporaneous medical record that is readily available to the patient and, subject to the patient's consent, to his or her other health care professionals; and v. include the electronic prescription information as part of the patient medical record." This document can be found at Internet site "http://www.ama-assn.org/ama1/upload/mm/annual03/bot7a03.rtf"

15.   At this time, DEA regulations do not recognize electronic transmission of prescriptions from prescribers to pharmacies by the internet. If a pharmacy receives prescription information for a schedule III-V prescription via the internet, the pharmacy must contact the prescriber via telephone and receive an oral prescription for the controlled substance, including the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address and registration number of the practitioner (21 CFR 1306.05(A)). The guidance document "Dispensing and Purchasing Controlled Substances Over the Internet" (DEA-191N) was published in the Federal Register on Friday, April 27, 2001 (66 FR 21181). A copy of this guidance document is available at the Office of Diversion Control website: http://www.deadiversion.usdoj.gov.

16.   Unless otherwise specified herein, the term "Pharmavet" refers to the e-mail address Pharmavet@hotmail.com and its operators.

## II.   OVERVIEW OF CRIMINAL ACTIVITY

17.   To order controlled substances from the organization that is the subject of the

7

investigation outlined in this affidavit:

a.    A customer must send a message to the email address pharmavet@hotmail.com.

b.    Once the parties agree to the terms of the transaction, the customer wires the money to Pharmavet via Western Union (WU), and emails Pharmavet the WU Money Transaction Control Number (MTCN).

c.    Pharmavet picks up the money at a WU location in Mexico, then ships or mails the customer the drugs from Southern California.

d.    Pharmavet neither requires nor requests any type of prescriptions from their customers.

e.    No one connected with the business is licensed by the DEA to store, distribute or import controlled substances.

18.    Pharmavet also fills bulk orders for controlled and non-controlled pharmaceutical drugs from various individuals, typically steroid dealers and internet pharmacy website owners operating within the United States.

19.    Pharmavet obtains these drugs in Mexico, smuggles the drugs into and ships the drugs from Southern California.

20.    A principal means of communication among the participants and customers in this organization is the email account pharmavet@hotmail.com.

A.    **Undercover Drug Purchase Number One - Percocet - March 2006**

21.    On April 3, 2006, using an undercover identity and the email address

8

jayson_henry@yahoo.com, SA Huff emailed pharmavet@hotmail.com, asking if drugs could be purchased from the owner of that email address. SA Huff had previously identified this email address by browsing the internet in an effort to purchase prescription drugs.

22.    SA Huff communicated via email with the owner of pharmavet@hotmail.com for a few days, and on April 5, 2006, Pharmavet agreed to sell SA Huff 50 tablets of 10 MG Percocet for $402.50. SA Huff gave Pharmavet the address of an undercover mailbox at 2000 Hamilton Street #703, Philadelphia, Pennsylvania.

23.    On April 06, 2006, SA Huff sent, via Western Union, $403.00 to MISAEL RODRIGUEZ SANCHEZ in Mexico, as directed by Pharmavet.

24.    On April 12, 2006, Pharmavet emailed to SA Huff a United Parcel Service (UPS) tracking number of 1z9363161273678862. SA Huff then logged onto the website www.ups.com and entered this tracking number. This revealed that the package was sent from Chula Vista, California and delivered on April 14, 2006, at 11:19 AM.

25.    On April 17, 2006, SA Huff checked the undercover mailbox listed above and obtained a gray UPS envelope from within the mailbox. The envelope was approximately 9 inches by 8 inches and was addressed to Jason Henry. Printed on the front of the envelope was the UPS tracking number listed above. The following return address was listed on the envelope:

9

ANGELICA ACEVEDO 619-428-0302
(619) 425-6533
THE UPS STORE #1657
STE A
627 H ST
CHULA VISTA CA 91910-4200

26.    Inside the package was a ziplock bag containing 50 Endocet 10 MG tablets. Endocet is

a generic form of Percocet. Endocet and Percocet are Schedule II controlled substances.

A subsequent test of the tablets conducted by a DEA Laboratory indicated that the pills

contained approximately 10 MG of oxycondone, the active ingredient in Percocet and

Endocet.

**B. Undercover Drug Purchase Number Two - Oxycontin - April 2006**

27.    On April 24, 2006, using an undercover identity and the email address

jayson_henry@yahoo.com, SA Huff emailed pharmavet@hotmail.com asking if the

owner of that account (Pharmavet) would sell Oxycontin.

28.    SA Huff negotiated with Pharmavet for several days, after which Pharmavet agreed to

sell SA Huff 25 tablets of 80 MG Oxycontin for $1,275. SA Huff gave Pharmavet the

address of an undercover mailbox at 2000 Hamilton Street #703, Philadelphia,

Pennsylvania. Pharmavet directed SA Huff to send the money to MISAEL RODRIGUEZ

SANCHEZ in Tijuana, Mexico, via Western Union.

29.    On May 03, 2006, SA Huff sent $1,275 to "SANCHEZ" via Western Union. The Western

Union charge for this transaction was $51.00, bringing the total to $1,326.00.

10

30.  On May 06, 2006, Pharmavet sent SA Huff an email containing the UPS tracking number for the package. The tracking number was 1z9363160374602510.

31.  On May 10, 2006, SA Huff checked the UPS website and discovered that there was a problem with the package. SA Huff called UPS and discovered that the undercover box number 703 had been left off of the shipping address. SA Huff requested to have the package held at a UPS location to be picked up.

32.  On May 11, 2006, SA Huff went to the UPS pickup location at 15 East Oregon Avenue, Philadelphia, Pennsylvania, and picked up the package that had been addressed and delivered to the undercover mailbox. The following return address was listed on the envelope:

        ANGELICA ACEVEDO 619-428-0302
        (619) 425-6533
        THE UPS STORE #1657
        STE A
        627 H ST
        CHULA VISTA CA 91910-4200

33.  Inside the package was a ziplock bag containing what appeared to be 25 green Oxycontin 80 MG tablets. On one side of the pills were the letters "ABG" and on the other side was the number "80." The drugs were forwarded to the DEA Laboratory for identification and analysis and ultimately tested positive for oxycodone, a Schedule II controlled substance.

C.  Undercover Drug Purchase Number Three - Oxycontin - February 2007

34.  On February 16, 2007,  using the undercover identity and the email address

11

jayson_henry@yahoo.com, SA Huff emailed pharmavet@hotmail.com asking if the operator of that account (Pharmavet) would sell SA Huff drugs.

35. Pharmavet negotiated with SA Huff for several days, after which Pharmavet agreed to sell SA Huff 30 tablets of 80 MG Oxycontin for $1500. SA Huff gave to Pharmavet the address of an undercover mailbox at 2000 Hamilton Street #703, Philadelphia, Pennsylvania. Pharmavet directed SA Huff to send the money to MISAEL RODRIGUEZ SANCHEZ in Tijuana, Mexico, via Western Union. On February 23, 2007, SA Huff sent $1,500 to "SANCHEZ" via Western Union. The Western Union charge for this transaction was $75.00, bringing the total to $1,575.00.

36. On February 28, 2007, Pharmavet sent SA Huff an email containing the United Parcel Service (UPS) tracking number for the package. The tracking number was 1z83x8251349454364.

37. On March 1, 2007, SA Huff checked the mailbox located at 2000 Hamilton Street, and retrieved a medium size UPS envelope addressed to Jason Henry, #703, 2000 Hamilton Street, Philadelphia, PA 19130. The return address on the package was Mr. Mail, (619) 690-4410, 551 East San Ysidro Blvd., San Ysidro, CA 92173.

38. Inside the package was a small white envelope inside of a small yellow envelope. Inside the yellow envelope was a ziplock bag containing what appeared to be 30 green Oxycontin 80 MG tablets. On one side of the pills were the letters "OC" and on the other side was the number "80." The drugs were forwarded to the DEA Laboratory for

12

identification and analysis and found to be oxycodone.

39.     From the Western Union records, SA Huff knows that an individual presenting himself

as MISAEL RODRIGUEZ SANCHEZ and giving a birth date of September 26, 1981, and

an address of "Carlos 55," picked up the money SA Huff sent to purchase the Oxycontin.

D.  **Undercover Drug Purchase Number Four-Ritalin-July 2007**

40.     On July 25, 2007, acting in the capacity of an online covert customer, SA Huff emailed

pharmavet@hotmail.com asking if the operator of that account (Pharmavet) would sell

Ritalin or Adderall.  Shortly thereafter, Pharmavet responded that they  had Ritalin

10mg.

41.     Pharmavet and SA Huff corresponded for several days, after which Pharmavet agreed to

sell SA Huff  120 tablets of 10 MG Ritalin for $207.  SA Huff gave the address of an

undercover mailbox at   2000 Hamilton Street #703, Philadelphia, Pennsylvania.

Pharmavet directed SA Huff  to send the money to ROBERTO FERMIN PEREZ

VALDIVIA in Tijuana, Mexico via Western Union (WU).

42.     On August 2, 2007, SA Matthew F. Giacobbi, using an undercover identity, sent $216.75

via Western Union to ROBERTO FERMIN PEREZ VALDIVIA in Tijuana, Mexico. The

Western Union charge for this transaction was $10.84 bringing the total to $227.59. SA

Giacobbi then logged into the undercover email account and sent Pharmavet an email

stating that the money had been sent.  Shortly thereafter, Pharmavet replied to the email

requesting that the WU receiver be changed to RAFAEL LABRADA LOPEZ.

13

43.    On August 6, 2007, SA Giacobbi returned to the WU location and changed the name. SA

Giacobbi then sent an email to Pharmavet stating that the name had been changed.

44.    On August 14, 2007, Pharmavet sent an email to the undercover email address stating "I

will send you 2 order because we are out of stock you can pay me in the next order." The

email also contained the following two DHL tracking numbers:

22951392155 and 22974117250.

45.    On August 27, 2007, SA Huff checked the mailbox located at 2000 Hamilton Street, and

retrieved two medium size envelopes addressed to the undercover identity used to make

this order. The return address on both packages was Mr. Mail, Package Shipper, 551 East

San Ysidro Blvd., San Ysidro, CA 92173, US. One envelope was orange, and the other

was white.

46.    Inside the white envelope was a tightly wrapped orange paper envelope with the number

22 written on the outside in black pen. Inside the paper envelope were 120 white tablets

contained in 12 blister packages. The following text was on the outside of the blister

packs:

"Novartis Ritalin Metilfenidato Comprimidos,10 mg Oral, Reg. No. 44836
SSA II,        Marca registrada,6016150-02"

47.    Inside the orange envelope was a tightly wrapped orange paper envelope with the

number 10 written on the outside in black pen. Inside the paper envelope were 120

white tablets contained in 12 blister packages. The following text was on the outside of

the blister packs:

14

"Novartis Ritalin Metilfenidato Comprimidos,10 mg, Oral, Reg. No. 44836
SSA II Marca registrada, 6016150-02"

48.  According to drug manufacturer NOVARTIS, the text on the two blister packs means

     that the tablets were manufactured in Mexico by "NOVARTIS affiliate and were not

     approved for U.S. distribution.

49.  The drugs were forwarded to the DEA Laboratory for identification and determined to

     be methylphenidate, a schedule II controlled substance.

50.  At no time did Pharmavet request or demand a prescription for any of the controlled

     substances distributed to SA Huff, and SA Huff never sent a prescription to Pharmavet

     authorizing the distribution of any controlled substance.  In addition, SA Huff never

     consulted with a doctor regarding obtaining a controlled substance, and  Pharmavet

     never asked whether SA Huff had consulted a doctor.

III.   SEARCH WARRANT for Email Account – May 2006

51.  On May 02, 2006, SA Huff swore to a search warrant before the Honorable Timothy R.

     Rice, United States Magistrate Judge, in the Eastern District of Pennsylvania. The search

     warrant ordered Microsoft Corporation, 1065 La Avenida, Mountain View, California,

     to provide the FBI with an exact copy of all email messages belonging to the email

     address pharmavet@hotmail.com.

52.  On May 08, 2006, SA Huff received a disk from Microsoft Corp.  The disk contained all

     emails that were stored on Hotmail servers that belonged to the email address

     pharmavet@hotmail.com.   More specifically, this disk contained the contents of

15

Pharmavet@hotmail.com's inbox folder, drafts folder, deleted items folder, sent items folder, and outbox folder at the time the copy was made by Microsoft personnel. The disk did not contain a copy of all emails ever sent by Pharmavet, and any emails that Pharmavet had cleared out of the deleted items box before the copy was made would not be contained on this disk. The disk contained over 400 email messages which had been sent/received between May 23, 2002 and 2006.

53.     Based upon tracking numbers from emails pertaining to drug orders, the investigating agents identified approximately 185 shipments of prescription drugs sent via the shipper DHL between October 2005 and May 2007. For all 185 shipments, the reference field on the DHL Airbill stated "(PCS) RODRIGUEZ, and the shipment was sent from the Mr. Mail package store located at 511 East San Ysidro, San Diego, CA 92173.

54.     The following represents a summary of the drugs ordered in the emails that were contained on the disk provided by Microsoft:

Schedule II (3241 tablets)

        218 tablets of OxyContin (unknown mg), a schedule II drug

        30 tablets of 20 mg OxyContin, a schedule II drug

        597 tablets of 40 mg OxyContin, a schedule II drug

        476 tablets of 80 mg OxyContin, a schedule II drug

        1860 tablets of 10 mg Ritalin, a schedule II drug

        30 tablets of 10 mg Oxycondone, a schedule II drug

16

30 tablets of Codeine, a schedule II drug

Schedule III (3495 tablets)

120 tablets of Codeine #3, a schedule III drug

1970 tablets of Vicodin, a schedule III drug

1405 tablets of 10 mg Hydrocodone, a schedule III drug

Schedule IV (3440 tablets)

2800 tablets of Valium, a schedule IV drug

640 tablets of Xanax, a schedule IV drug

Non-Controlled (650 tablets)

600 tablets of Soma, a non-controlled prescription drug

50 tablets of Viagra, a non-controlled prescription drug

*Total - 10,826 pills*

55.    SA Huff's review of the emails seized by search warrant reveals that at no time did any

of the operators or users of the email address Pharmavet@hotmail.com require, request

or demand a prescription for any of the controlled substances distributed to its

customers, nor was any prescription attached to any email ordering controlled

substances.

17

IV. **EVIDENCE THAT MISAEL RODRIGUEZ SANCHEZ AND JORGE ALAN RODRIGUEZ SANCHEZ USE AND OPERATE THE E-MAIL ACCOUNT PHARMAVET@HOTMAIL.COM**

A. **Misael Rodriguez Sanchez**

56.    From his review of the emails obtained by search warrant, SA Huff knows that MISAEL RODRIGUEZ SANCHEZ was the primary person designated to pick up money from Western Union from the sale of controlled substances. Based upon the emails and the records obtained from Western Union, SA Huff has determined that from January 2002 to July 2007, MISAEL RODRIGUEZ SANCHEZ made numerous pick ups of money from Western Union. This money was sent as payment for drug orders sent to pharmavet@hotmail.com email address. The customers also sent Money Transfer Control Numbers to the same address. For many of the pick ups by MISAEL RODRIGUEZ SANCHEZ, he supplied his birth date as September 26, 1981.

57.    The United States Department of State, Bureau of Consular Affairs maintains a record titled NIV Applicant Detail, which is a record of an application for visa for MISAEL RODRIGUEZ SANCHEZ. This application, which was approved on October 19, 2001, shows his date of birth as September 26, 1981, and place of birth as Baja California Norte (BC).

58.    According to department of motor vehicle information in Tijuana, Mexico, the Mexican driver's license application of MISAEL RODRIGUEZ SANCHEZ listed his father's name as "Jorge Rodriguez," with an address as "San Carlos" and his father's phone number as

18

"681-4819."  The Mexican driver's license application of JORGE ALAN RODRIGUEZ

SANCHEZ  listed his father's name as "Jorge Rodriguez Romero," with an address of

"Avenida San Carlos 55 La Mesa, Tijuana, B.C". and his phone number as "681-4819."

**B. Jorge Alan Rodriguez Sanchez**

59.    On June 21, 2002, customer James Graham sent an email to Pharmavet@hotmail.com in

which he informed Pharmavet that he had sent money by Western Union to JORGE

ALAN RODRIGUEZ SANCHEZ.

60.    On September 2, 2002, customer Mike Bradley sent an email to Pharmavet@hotmail.com

to the attention of Mr. Alan Rodriguez explaining that he needed vicodin or

hydrocodeine.

61.    On December 22, 2002, Pharmavet@hotmail.com sent an email to EliteFitness.com

proposing to act as a supplier of anabolic steroids.  The email was from "alan r."

62.    On July 11, 2002, customer "test osteron" requested a list of "anabolics" sold by

Pharmavet@hotmail.com.  Pharmavet responded with a Microsoft word document

listing prices for anabolic steroids.  The originator of a Microsoft word document may

be ascertained by right-clicking on the document and selecting the "properties" item on

the drop-down menu.  The author of the attachment to the email sent by Pharmavet to

"test osteron" was shown as "Alan Rodriguez."

63.    On April 14, 2007, pharmavet sent an email to itself with an attachment advertising a

mixed martial arts match on May 12, 2007, in Tijuana, Mexico.  The promoter of the

19

mixed martial arts match was listed as JORGE ALAN RODRIGUEZ SANCHEZ. The advertisement was on letterhead containing a logo "UCM Ultimate Challenge Mexico" surrounded by flames. The business address was listed as Calle David Alfaro Siqueiros #2987 Sona Rio Tijuana, B.C. Tel: 216 4752 (619) 410 6571, dm9721@gmail.com, www.ucmax.com.

64.    On April 16, 2007, an email from "jorge rodriguez bigaljars@hotmail.com" was sent to "rllamasm@casasdeo.com" with the same flyer and business address as listed in the paragraph above. It also contained the same logo depicting UCM Ultimate Challenge Mexico surrounded by flames. The email was sent "cc" to pharmvet@hotmail.com.

65.    On April 19, 2007, an email from Miguel Baruch baruch@agenciastaff.com was sent to Phamavet@hotmail.com containing an attachment with a logo "H7" and an email "Respond to me with the event dates and a "jpg" [file] of the logo."

66.    On April 19, 2007, an email from jorgegomez2004@hotmail.com was sent to pharmavet@hotmail.com. Attached was an advertisement for a mixed martial arts event in the Auditorium in Tijuana. The advertisement contains the UCM Ultimate Challenge Mexico logo with flames surrounding it. On April 21, 2007, Pharmavet@hotmail.com replied to that email with "saludos."

67.    On May 8, 2007, Pharmavet@hotmail.com sent an email to jorge.gomez@yahoo.com with an attachment. The attachment was an advertisement for a mixed martial arts event on May 12. The advertisement displays the "H7" logo as well as the UCM Ultimate

20

Challenge Mexico logo surrounded by flames.

68.    On May 14, 2007, a customer ordered Vicodin and oxycodone from someone using the pharmavet@hotmail.com email address. After exchanging emails concerning the details of the transaction, in which the person using the pharmavet email address agreed to expedite the shipping of the drug order, the customer replied by email, "Thanks Papa, you're the best!!! How did you do with the MMA [mixed martial arts] fight? Did you do alright? Let me know." The person using the Pharmavet@hotmail.com email address answered, "all ok, I am the promotor to.in jul 28 I will make the mexico Vs USA MMA." The website www.cdn.sherdog.com lists the results of the Ultimate Challenge Mexico Event that was held on July 28, 2007 in Tijuana Mexico.  Many of the fighters are also listed as fighters on the official Ultimate Challenge Mexico Website (ucmmma.com). The website Ucmmma.com contains the same Ultimate Challenge Mexico logo surrounded by flames as described above - the same logo that was found on the envelope in the possession of Jorge Alan Rodriguez Sanchez when he crossed the border from Mexico into the United States on February 26, 2008.

69.    On February 26, 2008, JORGE ALAN RODRIGUEZ SANCHEZ was stopped by border patrol officers at the border between Tijuana, Mexico and the United States.  In his possession was a Permanent Resident Card showing a date of birth of July 31, 1975. Also in his possession was a rental receipt for the Municipal Auditorium in Tijuana, Mexico, dated September 29, 2007. Ultimate Challenge Mexico sponsored a mixed martial arts

competition at the Municipal Auditorium in Tijuana on September 29, 2007. Also found

in his possession during the stop was an envelope containing the logo for UCM Ultimate

Challenge Mexico described above and the address Calle David Alfaro Siqueiros #2987

Sona Rio Tijuana, B.C. Tel: 216 4752 (619) 410 6571, dm9721@gmail.com,

www.ucmax.com.

V.    **EVIDENCE THAT THE FRUITS AND INSTRUMENTALITIES OF THE CRIME ARE LOCATED AT THE PREMISES TO BE SEARCHED**

70.    At the time of the border crossing on February 26, 2008, as stated in paragraph 67,

JORGE ALAN RODRIGUEZ SANCHEZ was driving in a  Red 2003 Chevrolet Truck

bearing California license plate 7D13363. NANCY MARTINEZ (Date of Birth: October

25, 1977) was a passenger.  MARTINEZ and SANCHEZ stated that they had lived at the

below residence for a few weeks:

> Camden Sierra at Otay Ranch
> 1390 Santa Alicia Avenue, #10208
> Chula Vista, CA  91913

71.    On March 12, 2008, in response to a subpoena that had previously been issued to MSN

Hotmail, for all subscriber information and computer logs pertaining to the email address

pharmavet@hotmail.com, SA Huff learned that an individual successfully logged into the

email account pharmavet@hotmail.com, using the Internet Protocol (IP) Address

72.220.40.129 on the following dates:

> 3/1/2008 4:04:24 PM (PST)

3/4/2008 11:59:39 PM (PST)

3/5/2008 11:03:50 AM (PST)

3/5/2008  11:58:55 AM (PST)

3/7/2008 11:09:01 AM (PST)

3/10/2008  12:06:06 AM (PDT)

3/10/2008 10:54:04 AM (PDT)

3/10/2008 1:18:11 PM (PDT)

3/10/2008 2:12:00 PM (PDT)

3/11/2008 11:28:45 AM (PDT)

3/11/2008 3:58:15 PM (PDT)

3/11/2008 8:04:23 PM (PDT)

72.    On March 26, 2008, SA Huff received information in response to a subpoena issued to

Cox Communications Inc., which revealed that for the above 12 dates, the IP Address

72.220.40.129 was leased to Kristen Tarantino, and the internet connection terminated

at 1390 Santa Alicia Avenue, #10307, Chula Vista, CA  91913.  Apartment 10307 is

almost directly above apartment 10208 (the apartment shared by Jorge Rodriguez and

Nancy Martinez).

73.    The Cox Communication subpoena also listed Nancy Martinez as the subscriber for Cable

Television service at 1390 Santa Alicia Avenue, Apt. 10208, Chula Vista, CA.   Cox does

not provide internet access to Martinez at this address.

23

74.    On March 27, 2008, FBI SAs Adam Pranter and I, using a laptop loaded with a software program called iStumbler, determined that there were four open wireless internet connections in the vicinity of 1390 Santa Alicia Avenue, Apts. 10208 and 10307.

75.    Piggybacking occurs when one person uses another's open internet connection to access the internet without that person's permission.  In order for piggybacking to occur, first one individual must have an internet connection to which a wireless router is connected. The wireless router's security settings must be set such that the router does not require a user name and password to connect.  A second individual, usually residing in a nearby residence, such as in an apartment complex or neighborhood, then brings his/her computer, equipped with a wireless network card, into range of the wireless router and uses the router to connect to the internet.  A computer that is within approximately 120 feet of a wireless router can use it to connect to the internet.  I therefore have reason to believe that Jorge Rodriguez is using the internet connection of Apartment 10307 to connect to the internet using the email address pharmavet.com.

76.    On March 26, 2008, Jorge Alan Rodriguez Sanchez crossed into the United States from Mexico at the San Ysidro Port. At the time of the crossing, Sanchez was in a 2004 Nissan bearing California license plate 5KXP850. On March 27, 2008, I observed this vehicle parked in front of the complex at 1390 Santa Alicia Avenue, Chula Vista, CA  91913.

77.    On   April   8,   2008,   a   cooperating   source,   using   the   email   account mark.stewart93@yahoo.com, sent an email to pharmavet@hotmail.com requesting

24

information about purchasing Ritalin. On April 9, 2008, Pharmavet responded stating

that 120 tablets of Ritalin 10 mg could be purchased for $180 plus 15 % for shipping.

C.     **Evidence Concerning Brenda Gisela Favela Sepulveda**

78.     On May 1, 2007, and May 2, 2007, Don Morgan, 5705 95TH PL SW,MUKILTEO, WA

98275, using the email address info@morganinsurance.com, corresponded with

pharmavet@hotmail.com. In the correspondence, Morgan stated that he wanted to

purchase "20 tabs, 80mg," and requested that Pharmavet email him the bank account

information. Pharmavet replied that the bank account was a Washington Mutual

Checking Account # 309-123378-9 in the name of Brenda Gisela Favela Sepulveda.

Morgan then replied stating that he had put $1240 into that account. A review of the

evidence indicates that "20 tabs, 80mg" means 20 tablets of 80 mg Oxycontin.

79.     COMPUTER SEARCH PROTOCOL

With the approval of the Court in signing this warrant, agents executing this search

warrant will employ the following procedures regarding computers that may be found

on the premises which may contain information subject to seizure pursuant to this

warrant:

Forensic Imaging

a.     After securing the premises, the executing agents will consult with a computer

specialist to determine the feasibility of obtaining forensic images of electronic

storage devices while onsite. The feasibility decision will be based upon the

25

number of devices, the nature of the devices and the volume of data to be imaged.
The preference is to image onsite if it can be done in a reasonable amount of time
and without jeopardizing the integrity of the data and the safety of the agents.
The number and type of computers and other devices and the number, type and
size of hard drives are of critical importance.  It can take several hours to image
a single hard drive - the bigger the drive, the longer it takes.  As additional
devices and hard drives are added, the length of time that the agents must remain
onsite can become overly intrusive, dangerous and impractical.

b.    If it is not feasible to image the data on-site, the computer equipment and any
peripherals will be seized and transported offsite for imaging. Once a verified
image has been obtained, the owner of the equipment will be notified and the
equipment returned within thirty (30) days of seizure absent further application
to this court.

c.    A forensic image is an exact physical copy of the hard drive or other media.  It
is essential that a forensic image be obtained prior to conducting any search of the
data for information subject to seizure pursuant to this warrant. A forensic image
captures all of the data on the hard drive or other media without the data being
viewed and without changing the data in any way.  This is in sharp contrast to
what transpires when a computer running the common Windows operating
system is started, if only to peruse and copy data - data is irretrievably changed

26

and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

d.    Special software, methodology and equipment is used to obtain forensic images. Among other things, forensic images normally are (hashed(, that is, subjected to a mathematical algorithm to the granularity of 1038 power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a hash value, confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

27

<u>Forensic Analysis</u>

e.      After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user(s computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

f.      Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software also can be very tedious. It can take days to properly search a single hard drive for specific data. Searching by keywords, for example, often yields many thousands of (hits,( each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant (hit( does not end the review process. As mentioned above, the computer may have stored information about the data at issue: who created it, when it was created, when was it last accessed, when

28

was it last modified, when was it last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Operation of the computer by non-forensic technicians effectively destroys this and other trace evidence. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Microsoft Outlook data is an example of a commonly used program which stores data in a non-textual, proprietary manner( ordinary keyword searches will not reach this data. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text.

g.    Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has become mind-boggling. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop

29

computers. And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Even perusing file structures can be laborious if the user is well-organized. Producing only a directory listing of a home computer can result in thousands of pages of printed material most of which likely will be of limited probative value.

h.      Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained; criminals can mislabel and hide files and directories, use codes to avoid using keywords, encrypt files, deliberately misspell certain words, delete files and take other steps to defeat law enforcement. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant.

i.      All forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant.

VI.     CONCLUSION

80.     Through training and experience, I know that individuals involved in the distribution of

30

drugs usually keep evidence of drug dealing in their residences and other locations owned or controlled by them. This ongoing investigation has shown that the email address pharmavet@hotmail.com has been used to illegally distribute controlled substances for at least 22 months. In my experience, individuals retain emails on laptops and desk top computers for long periods of time, and laptop computers are often found at residences or vehicles under the control of the user. Records of past activity, such as emails, are likely to be maintained over time, especially if the activity involved hundreds of thousands of dollars obtained over many months, as in this case.

81.    Based on the information provided above, there is probable cause to believe that the residence located at 1390 Santa Alicia Avenue, #10208, Chula Vista, CA 91913 contains evidence of the commission of the criminal offenses set forth above. It is therefore requested that a search warrant be issued to search the location described in this Affidavit for items identified in Attachment A, which items may constitute evidence of the offense as stated above.

MARK KOLENDA
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 29
~~30th~~ day of April, 2008.

HONORABLE
United States Magistrate Judge

31        **NITA L. STORMES
U.S. MAGISTRATE JUDGE**